# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| VIDEOLABS, INC.<br><br>Plaintiff,<br><br>v.<br><br>TCL TECHNOLOGY GROUP CORPORATION; TCL ELECTRONICS HOLDINGS, LTD. (F/K/A TCL MULTIMEDIA TECHNOLOGY HOLDINGS, LTD.); TCL INDUSTRIES HOLDINGS CO., LTD.; TCL KING ELECTRICAL APPLIANCES (HUIZHOU) CO. LTD; T.C.L. INDUSTRIES HOLDINGS (H.K.) LIMITED; TTE CORPORATION; TCL MOKA INTERNATIONAL LIMITED; TCL MOKA MANUFACTURING S.A. DE C.V.; MANUFACTURAS AVANZADAS S.A. DE C.V.; TCL SMART DEVICE (VIETNAM) CO., LTD.; SCHENZHEN TCL NEW TECHNOLOGY CO. LTD., TCL OPTOELECTRONICS TECHNOLOGY (HUIZHOU) CO., LTD., and TCL OVERSEAS MARKETING LTD.;<br><br>Defendants. | Civil Action No.:  2:25-cv-00161<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff VideoLabs, Inc. ("VL" or "VideoLabs") through its attorneys, for its Complaint against TCL Technology Group Corporation; TCL Electronics Holdings, Ltd. (f/k/a TCL Multimedia Technology Holdings, Ltd.); TCL Industries Holdings Co., Ltd.; TCL King Electrical Appliances (Huizhou) Co. Ltd.; T.C.L. Industries Holdings (H.K.) Limited; TTE Corporation; TCL Moka International Limited; TCL Moka Manufacturing S.A. de C.V.; Manufacturas Avanzadas S.A. de C.V.; TCL Smart Device (Vietnam) Co., Ltd.; Schenzhen TCL New Technology Co. Ltd., TCL Optoelectronics Technology (Huizhou) Co., Ltd., and TCL Overseas Marketing Ltd. (collectively, "Defendants" or "TCL"), demand a trial by jury and allege as follows:

## **INTRODUCTION**

1.      Digital video has become fundamental to how society interacts, communicates, educates, and entertains. In fact, video consumption now accounts for more than 82% of all Internet traffic.[1] The ability to reliably provide high-quality and secure video content drives the growth of digital platforms that are increasingly integral to the global economy.

2.      The advent of high-quality video as a staple of digital consumption did not happen instantaneously. As with any complex technology, digital video presented implementation challenges. Many companies spent many years and resources to develop new and innovative technologies that guide how video is created, streamed, secured, managed, and consumed.

3.      Various inventions and technological advances have transformed digital video. Some of these technologies, such as techniques to efficiently compress video file size, address central challenges to storing and transmitting video. Others enable video content to be efficiently and securely streamed to the many user devices that exist today. Yet others involve managing and

---

[1] *See The Sustainable Future of Video Entertainment*, INTERDIGITAL (Aug. 2020), https://www.interdigital.com/white_papers/the-sustainable-future-of-video-entertainment?submit_success=true.

organizing videos to provide viewers easier access to content and address how they interact with content. Successful video streaming thus requires a myriad of technologies that necessarily coordinate with one another.

4.      Because various companies played roles in developing the foundational technology for today's digital video, no single company can provide the high-quality video experiences that consumers have come to expect without using technology owned by other companies. Companies wisely focus their innovation activities and R&D investments on developing unique products and services while relying on the sum total of all other industry investment in the various technologies that enable their products and services to work in the global, connected technology market.

5.      The founders of VideoLabs recognized this problem and understood that collective action was needed to address it. If the companies that developed critical video technologies worked together, everyone could benefit: all innovators could receive fair compensation for their contributions, companies deploying video technology could respect other innovators' patented technologies and license them on affordable and predictable terms, and consumers could experience better and more affordable video technology.

6.      In 2019, with support from widely recognized industry leaders, VideoLabs launched a platform to achieve these goals. VideoLabs spent millions of dollars and thousands of hours analyzing the video space and identifying the patents that reflect the innovations with the highest impact. VideoLabs then compiled a portfolio of these core patents, obtaining them from leading companies, including Hewlett Packard Enterprise, Alcatel-Lucent S.A., Siemens AG, Swisscom AG, 3Com, Panasonic, LG, and Nokia.

7.      VideoLabs then opened-up participation in its platform to all willing companies. In exchange for low-cost membership or licensing fees, VideoLabs provides efficient access to its

aggregated patent portfolio and a commitment to seek out the most important patents in the video industry and acquire them to the benefit of the industry. Many prominent companies recognized the benefits of the VideoLabs platform and worked with VideoLabs to efficiently and responsibly license its video technology patents.

8.    Today, VideoLabs' licensing platform has evolved and grown significantly from the early days. VideoLabs' primary focus continues to be serving patent implementers in the broader video industry by identifying, acquiring, aggregating, and licensing high-quality patents through its unique collective platform and providing companies flexible licensing structures (including membership) for more efficient licensing. VideoLabs has expanded its focus on serving patent innovators to provide them a better path to realize fair compensation for their patents. VideoLabs also works in partnership with patent owners by building and running independent licensing programs specifically focused on licensing the partner's patent portfolio as a service to them and the IP industry.

9.    To this day, VideoLabs continues to promote an efficient, respected, and balanced intellectual property environment where technology companies have predictable design freedom and innovators who contribute impactful patented inventions can obtain fair and just compensation. It has and continues to successfully bring on many patent owners, licensees and members to its efficient and equitable licensing platform. Equitable licensing dictates that all patent implementers accept their responsibility to license. When one (or many) peer company(ies) elects to holdout or refuses to negotiate in good faith for a license to valid patents that are infringed and enforceable, it unfairly disadvantages those companies who chose to license responsibly.

10.    Unfortunately, TCL has not worked responsibly to license VideoLabs' video technology patents. TCL is one of the world's largest users of video technologies and sells smart TVs, tablet computers and mobile devices. It is enmeshed in practically every aspect of video, from

creation to processing, delivery, and display.

11.    VideoLabs contacted TCL in August 2022 to offer TCL the benefit of VideoLabs' platform and to alert it to its use of VideoLabs' patented technology. Despite the parties engaging in a few licensing discussions, TCL refuses to take a license. Accordingly, VideoLabs felt that it had no recourse but to file an action to stop TCL's unauthorized use of VideoLabs' patents. Failure to take action would undermine the equity and viability of VideoLabs' licensing platform and permit further free riding by TCL of the significant innovations of VideoLabs' patents.

12.    This case is ultimately about ensuring the integrity of the patent system and compensating patent owners for their protected innovations. Respect for intellectual property, as the law requires, is essential to incentivize innovation and promote technological progress. Accordingly, VideoLabs brings this action under the patent laws, 35 U.S.C. § 1 *et seq.*, in order to stop TCL's willful infringement of U.S. Patent Nos. 8,291,236, 8,667,304, 7,769,238, 8,139,878, 7,970,059, 7,525,535 and 8,220,027 (collectively, "Asserted Patents").

## THE PARTIES

13.    VL was founded in 2018 as part of an industry-sponsored and funded effort to reduce the cost and risk of technological gridlock associated with diverse patent ownership. VL's leadership has decades of experience in intellectual property licensing, during which they have completed over 1,000 intellectual property transactions worldwide and drawn more than $6 billion in revenue.

14.    VL is a corporation organized under the laws of the State of Delaware, with its principal place of business in Palo Alto, California.

15.    On information and belief, TCL Technology Group Corporation ("TCL Technology") is a company duly organized and existing under the laws of the People's Republic of China, with its principal place of business located at No. 26, the Third Road, Zhongkai Avenue, Huizhou City,

Guangdong, China 516006, and may be served pursuant to the provisions of the Hague Convention. TCL Technology may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in the state of Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of that business.

16.     On information and belief TCL Electronics Holdings, Ltd. (f/k/a TCL Multimedia Technology Holdings, Ltd.) ("TCL Electronics") is a limited liability company duly organized and existing under the laws of the Cayman Islands, having an address of 7th Floor, Building 22E, 22 Science Park East Avenue, Hong Kong Science Park, Shatin, New Territories, Hong Kong. TCL Electronics may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in the state of Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of that business.

17.     On information and belief TCL Electronics is an indirect wholly owned subsidiary of TCL Technology. TCL Electronics is involved in the manufacture and sales of televisions, smart mobile phones, smart connective devices and services, smart commercial display and smart home products and the provision of Internet platform operating services. This action arises out of that business.

18.     On information and belief, TCL Industries Holdings Co., Ltd., is a corporation organized and existing under the laws of the People's Republic of China with a principal place of business at 22nd Floor, TCL Technical Tower, Huifeng Third Road, Zhongkai Development Zone, Huizhou, Guangdong, China 516006. TCL Industries Holdings Co., Ltd., is the ultimate controlling shareholder of TCL Electronics. This action arises out of that business.

19.    On information and belief, TCL King Electrical Appliances (Huizhou) Co. Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of businesss at No. 78, Huifeng 4 Road, Zhongkai Development Zone Huizhou, 516006 P.R. China. It is a subsidiary of TCL Holdings (BVI) Limited and a parent of Shenzhen TCL New Technology Co. Ltd. This action arises out of that business.

20.    On information and belief T.C.L. Industries Holdings (H.K.) Limited is a corporation organized and existing under the laws of Hong Kong, with its principal place of business at 8th Floor, Building 22E, Phase Three, Hong Kong Science Park, Pak Shek Kok, New Territories, Hong Kong. This action arises out of that business.

21.    On information and belief TTE Corporation is a corporation organized and existing under the laws of the British Virgin Islands with its principal place of business at 7th Floor, Building 22E, 22 Science Park East Avenue, Hong Kong Science Park, Shatin, New Territories, Hong Kong. This action arises out of that business.

22.    On information and belief TCL Moka International Limited is a Hong Kong corporation with a principal place of business at 7th Floor Hong Kong Science Park, Building 22E, 22 Science Park East Avenue, Shatin, New Territories, Hong Kong or 13th Floor, TCL Tower, 8 Tai Chung Road, Tsuen Wan, New Territories, Hong Kong. This action arises out of that business.

23.    On information and belief TCL Moka Manufacturing S.A. de C.V. is a company organized under the laws of Mexico with a principal place of business at Calle Cuarta, No. 55, Ciudad Industrial Nueva Tijuana, BJ 66050, Mexico. This action arises out of that business.

24.    On information and belief Manufacturas Avanzadas S.A. de C.V. is a corporation organized and existing under the laws of Mexico with a principal place of business at Blvd. Independencia No. 2151, Ciudad, Juarez, Chihuahua, 32580, Mexico. This action arises out of that

business.

25.    On information and belief TCL Smart Device (Vietnam) Co., Ltd. is a corporation organized and existing under the laws of Vietnam with its principal place of business at No. 26 VSIP II-A, Street 32, Vietnam Singapore Industrial Park II-A, Tan Bihn Commune, Bac Tan Uyen District, Binh Duong Province, 75000, Vietnam. This action arises out of that business.

26.    On information and belief Schenzhen TCL New Technology Co., Ltd., is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business at 9th Floor, TCL Electronics Holdings Limited Building, TCL International E City, No. 1001 Zhongshan Park Road, Nanshan, China. This action arises out of that business.

27.    On information and belief TCL Optoelectronics Technology (Huizhou) Co., Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business at Ltd. No. 78 Huifeng Si Rd, Zhongkai High-New Development Zone, Huizhou Guangdong, 516006, China. This action arises out of that business.

28.    On information and belief TCL Overseas Marketing Ltd. is a corporation organized and existing under the laws of the British Virgin Islands with its principal place of business at 5th Floor, Building 22E, 22 Science Park East Avenue, Hong Kong Science Park, Shaitin, New Territories, Hong Kong. This action arises out of that business.

29.    On information and belief T.C.L. Industries Holdings (H.K.) Limited is the ultimate parent company of the other named Defendants and, as the ultimate parent, induces its subsidiaries, affiliates, retail partners and customers in the making, using, selling, offering for sale and/or importing of products accused of infringement in this Complaint. This action arises out of that business.

30.    On information and belief Defendants are part of the same corporate structure and

distribution chain for making, using, selling, offering for sale and/or importing the accused products in the United States, including in this State and this District. Defendants do business as a collective whole under the TCL brand.

31.    On information and belief Defendants are part of an interrelated group of companies known as "TCL," which together comprise one of the largest makers and sellers of televisions in the United States, including the TCL brands.

32.    On information and belief Defendants and their affiliates are part of the same management, common ownership, advertising platforms, facilities, distribution chains and accused product lines.

33.    On information and belief Defendants and their affiliates operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged in this Complaint.

34.    The parties to this action are properly joined under 35 U.S.C. § 299 because of the right to relief asserted against Defendants jointly and severally arises out of the same series of transactions and occurrences relating to the making, importing, using, offering for sale and selling of the same products or processes. Additionally, questions of fact common to all Defendants will arise in this action.

## **JURISDICTION AND VENUE**

35.    This action arises under the patent laws of the United States, Title 35 of the United States Code. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a).

36.    This Court has personal jurisdiction over Defendants in this action pursuant to due process and/or the Texas Long Arm Statute because (1) Defendants conduct business and continue

to conduct business in Texas, (2) Defendants have committed and continue to commit acts of patent infringement in this District, by among other things, making, using, offering to sell and selling accused products in Texas and/or importing accused products into Texas, including by Internet sales and sales via retail and wholesale stores, inducing others to commit patent infringement in Texas and/or committing at least a portion of any other infringement alleged herein. In addition, or in the alternative, this Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(2).

37.     This Court previously found that a number of Defendants are subject to personal jurisdiction in this forum. *See Canon, Inc. v. TCL Elecs. Holdings Ltd.*, No. 2:18-cv-00546-JRG, 2020 WL 1478356, at * 3 (E.D. Tex. Mar. 25, 2020).

38.     On information and belief, personal jurisdiction also exists specifically over each of the Defendants because they have overlapping executives, interlocking corporate structures and close relationships as manufacturer, importer and distributor of accused products.

39.     Venue is proper in this District pursuant to at least 28 U.S.C. §1391 and §1400(b). On information and belief, Defendants have conducted and continue to conduct business in this District; (2) Defendants have committed and continue to commit acts of patent infringement in this District and (3) Defendants are foreign entities.

### THE VIDEOLABS ASSERTED PATENTS

**A.  U.S. Patent No. 8,291,236**

40.     U.S. Patent No. 8,291,236 (the "'236 patent"), titled "Methods and Apparatuses for Secondary Conditional Access Server," issued on October 16, 2012. VL owns all rights and title to the '236 patent, as necessary to bring this action. A true and correct copy of the '236 patent is attached as Exhibit A.

41.     The original assignee of the '236 patent is Digital Keystone, Inc. ("Digital Keystone")

a Silicon-Valley based video technology company. Digital Keystone develops digital entertainment technologies, including security software for video applications. In the early 2000s, when the inventions of the '236 patent were in development, Digital Keystone was developing world-first digital entertainment solutions that bridged the personal computer, consumer electronics and content industries. Next generation digital cable TVs, PC-based entertainment systems and media distribution networks were powered by Digital Keystone hardware and software technologies. And Digital Keystone was also licensing its industry-leading security technology to TV broadcasters, consumer electronics manufacturers, developers of digital home components, and chip manufacturers.[2] In partnership with Microsoft and CableLabs, Digital Keystone developed the world's first secure Pay TV bridge, which was demonstrated by Bill Gates in his keynote speech during the 2006 Consumer Electronics Show.[3] Digital Keystone was at the forefront of enabling secure content access throughout the entire home.

42.     Conditional access ("CA") refers to techniques for limiting the access of content (such as TV programs and movies) to authorized users. CA systems have historically been developed for both cable TV (CAS) and, more recently, for OTT services (DRM). Regardless of the implementation, conditional access serves as a type of access management, requiring certain criteria to be met before granting access to protected content. For example, in a CA system for digital television, the media content is scrambled (encrypted) before broadcasting. The key used for

---

[2] *Company Overview*, Digital Keystone (2003).
https://web.archive.org/web/20031206063740/http://www.digitalkeystone.com/profile/mission.htm

[3] *Microsoft and CableLabs Announce Agreement to Enable High-Definition Digital Cable Programming on Windows-Based PCs* (Press release), Microsoft, November 16, 2005; *Gates Outlines Vision for the Digital Lifestyle and Showcases New Products and Technologies From Microsoft* (Press release), Microsoft, January 4, 2006. https://https://news.microsoft.com/2005/11/16/microsoft-and-cablelabs-announce-agreement-to-enable-high-definition-digital-cable-programming-on-windows-based-pcs/.

scrambling/descrambling the media content in a CA system is called a control word, and it is securely provided to subscribers through entitlement control messages and entitlement management messages. A security device, such as a set top box, uses the control word to descramble (decrypt) the received media content and reproduce the content for display. Similarly, in a DRM system for content streaming, the content is encrypted before distribution. The key(s) used for encrypting the media content in a DRM system is/are typically maintained by a license server and requested by the media player when the content is attempted to be played. The license server authenticates the requesting user, and the decryption keys are provided to permitted users. The media player uses the received keys to decrypt and render the content for viewing.

43.     In digital television, for example, the media content (e.g., video and audio signals) is converted into a digital form using the MPEG-2 format. The digital form of the media content of one program is multiplexed together with those of other programs for transmission so that multiple programs appear to be transmitted simultaneously. The CA system scrambles the digital form of programs and transmits the entitlement control messages and the entitlement management messages with the digital form of programs for broadcast either within the multiplex (e.g., satellite) or through an out-of-band channel (e.g., cable).

44.     Typically, a set-top box (STB) at the receiving end descrambles the data stream and decodes the MPEG-2 data for viewing. A tuner portion of the STB receives the incoming signal, demodulates it and reconstitutes the transport stream, which contains many packets of information. The STB can de-multiplex the entitlement management messages and entitlement control messages and the media content. The data (e.g., service key and control word) contained in the entitlement management message and entitlement control message are used to descramble the encrypted programming material. The STB then renders the MPEG-2 data for viewing.

45.     A digital rights management (DRM) system manages rights digitally. Digital rights management uses encryption software to protect electronic information and prevent widespread distribution. In a typical digital rights management scheme, a DRM server software program "wraps" the digital content through encryption according to applicable policies. A DRM client software program "unwraps" the content and makes it accessible in accordance with its rights. The rights are typically distributed to clients separately from the "wrapped" electronic information. DRM clients may include desktop PCs, handheld devices, set-top boxes, mobile phones and other portable devices. In addition to encrypting/scrambling the digital content to limit the distribution, a digital rights management system may also provide the description, identification, trading, protection, monitoring and tracking of various forms of rights.

46.     Both CAS and DRM systems are critically important technologies for securing valuable content programming intended for myriad consumer devices. To individually manage each such device, such as a set-top box, a mobile phone, a streaming media device, a laptop or desktop computer, or a smartTV, each device is typically provided with a unique identity so that the CA or DRM system can provide the necessary keys specifically for use on only the intended device. In this way, the integrity of the decryption keys can be maintained within the content provider's security domain. Typically, each device has a unique, secret user key so that an entitlement management message or a DRM license key for one device can only be decrypted using the unique user key of that device.

47.     In the early-2000s, content consuming devices were proliferating rapidly, each with different device security platforms and capabilities, and content delivery standards were evolving to address the growing need for securing the integrity of the content being delivered to myriad networked devices. Conditional access techniques at the time of the invention suffered from the

problem of being limited to one security technique so that each device was required to be associated with the security technique to operate correctly in a network.

48.    The '236 patent addresses this problem by providing a more flexible security model that could allow devices to operate correctly under different security techniques while still maintaining the benefits of the primary security system of a content provider with full ability to control the dissemination of content securely across networking components with different security features and platforms. Ex. A at 2:56-60 ("bridging two security systems so that a primary security system can control premium content distribution to external devices secured by a secondary security system"). The '236 patent allows, among other things, content to be distributed to legitimate, authorized devices of two different security systems. *Id.* at 3:1-7. The inventors developed a novel approach by implementing a new type of networked device to bridge primary and secondary security domains and pass access-protected content from the primary security domain to the secondary security domain, such as a localized network within the home, or the Internet, so that authorized devices in the secondary security domain can access secured content. *Id.* at 7:19-43; 7:66 – 8:2; 8:39-61. The inventors recognized that incorporating security messages into the primary conditional access protocols could allow the networked device to act as a client in the primary security domain and as a control information provider of the secondary security domain. *Id.* at 7:19-39. The networked device common to both domains could then conditionally allow clients in the secondary security domain to access the content, converting the protected content from one protected format to another protected format. *Id.* at 7:40-43; 17:42-51.

49.    As such, the '236 patent describes and claims novel improvements to the networked system allowing content to be distributed to proper devices, including devices that do "not support[] the primary digital rights management system" of the content provider. *Id.* at 3:8-15. The '236 patent

thus allows, among other things, securely transferring content (e.g., premium video content) to a greater number of devices and types of devices.

**B.   U.S. Patent No. 8,667,304**

50.     U.S. Patent No. 8,667,304 (the "'304 patent"), titled "Methods and Apparatuses for Secondary Conditional Access Server," issued on March 4, 2014. VL owns all rights and title to the '304 patent, as necessary to bring this action. A true and correct copy of the '304 patent is attached as Exhibit B.

51.     The original assignee of the '304 patent is Digital Keystone, Inc. ("Digital Keystone"), a Silicon-Valley based video technology company. Digital Keystone develops digital entertainment technologies, including security software for video applications. In the early 2000s, when the inventions of the '304 patent were in development, Digital Keystone was developing world-first digital entertainment solutions that bridged the personal computer, consumer electronics and content industries. Next generation digital cable TVs, PC-based entertainment systems and media distribution networks were powered by Digital Keystone hardware and software technologies. And Digital Keystone was also licensing its industry-leading security technology to TV broadcasters, consumer electronics manufacturers, developers of digital home components, and chip manufacturers.[4] In partnership with Microsoft and CableLabs, Digital Keystone developed the world's first secure Pay TV bridge, which was demonstrated by Bill Gates in his keynote speech during the 2006 Consumer Electronics Show.[5] Digital Keystone was at the forefront of enabling secure content access throughout

---

[4] *Company Overview*, Digital Keystone (2003).
https://web.archive.org/web/20031206063740/http://www.digitalkeystone.com/profile/mission.htm.

[5] *Microsoft and CableLabs Announce Agreement to Enable High-Definition Digital Cable Programming on Windows-Based PCs* (Press release), Microsoft, November 16, 2005; *Gates*
(continued...)

the entire home.

52.    As discussed with regard to the '236 patent *infra*, both CAS and DRM systems are critically important technologies for securing valuable content programming intended for myriad consumer devices. To individually manage each such device, such as a set-top box, a mobile phone, a streaming media device, a laptop or desktop computer, or a smartTV, each device is typically provided with a unique identity so that the CA or DRM system can provide the necessary keys specifically for use on only the intended device. In this way, the integrity of the decryption keys can be maintained within the content provider's security domain. Typically, each device has a unique, secret user key so that an entitlement management message or a DRM license key for one device can only be decrypted using the unique user key of that device.

53.    In the early-2000s, content consuming devices were proliferating rapidly, each with different device security platforms and capabilities, and content delivery standards were evolving to address the growing need for securing the integrity of the content being delivered to myriad networked devices. Conditional access techniques at the time of the invention suffered from the problem of being limited to one security technique so that each device was required to be associated with the security technique to operate correctly in a network.

54.    The '304 patent is a continuation of the '236 patent, and, like the '236 patent, the '304 patent addresses this problem, allowing, among other things, content to be distributed to legitimate, authorized devices of two different security systems. Ex. B at 3:4-10. Content may be distributed to proper devices, including devices that do "not support[] the primary digital rights management system" of the content provider. *Id.* at 3:11-11. As such, the '304 patent allows, among other things,

---

*Outlines Vision for the Digital Lifestyle and Showcases New Products and Technologies From Microsoft* (Press release), Microsoft, January 4, 2006.
https://news.microsoft.com/2005/11/16/microsoft-and-cablelabs-announce-agreement-to-enable-high-definition-digital-cable-programming-on-windows-based-pcs/.

securely transferring content (e.g., premium video content) to a greater number of devices and types of devices by providing a more flexible security model that could allow devices to operate correctly under different security techniques while still maintaining the benefits of the primary security system of a content provider with full ability to control the dissemination of content securely across networking components with different security features and platforms.

**C. U.S. Patent No. 7,769,238**

55.    On August 3, 2010, the United States Patent Office issued U.S. Patent No. 7,769,238, titled "Picture Coding Method And Picture Decoding Method" (the "'238 patent"). VL owns all rights and title to the '238 patent, as necessary to bring this action. A true and correct copy of the '238 patent is attached hereto as Exhibit C.

56.    The '238 patent generally relates to video and audio coding. Video and audio coding refers to both the encoding and decoding of video or audio content. Video and audio coding may include compression techniques that minimize the size of the data that is sent between the encoder and the decoder by, e.g., removing redundancies and then efficiently representing the remaining data for transmission.

57.    The '238 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '238 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '238 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

58.     Encoding video content allows the content to be made small for storage and transmission, while decoding pursuant to the '238 patent permits the viewer to watch high-quality content on his or her device. In addition to making real-time streaming of content possible, every incremental increase in compression efficiency yields substantial benefits to companies that store, process, transmit or access video.

59.     The '238 patent describes breakthrough techniques for decoding audiovisual content so that it can be transmitted and stored with fewer resources. The patent vastly improves upon existing methods, and the core technology it describes has been used throughout the industry for years as the gold standard for coding video.

60.     In particular, the '238 patent is directed to decoding audio and video content. With respect to video, the '238 patent describes a type of coding called "Context-based Adaptive Variable Length Coding," or "CAVLC." *See, e.g.*, Ex. C at 1:49-52. Content encoded would then be stored or transmitted before ultimately being decoded for playback using the techniques of the '238 patent.

61.     When encoded, the image data in a particular image block is represented by, among other things, "coefficients." *Id*. at 1:63-67; 7:38-43; 21:60-66; 25:29-36. Larger coefficients for a block may indicate a larger amount of changes in that block as compared with a reference block. *See id.* For many blocks, there are no such changes, and so all the coefficients have a value of zero. *See id.* at 21:60-66. The inventors of the '238 patent recognized that these "zero-coefficient" blocks allow for compression. *See*, *e.g.*, *id.* at 1:49-52.

62.     The inventors of the '238 patent realized that the decoder did not need to know every single time a zero-coefficient block existed; rather, the decoder needs to know only when blocks have *non-zero* coefficients. They devised a technique wherein data about zero-coefficient blocks are effectively not encoded at all, and only non-zero coefficient block data is stored and transmitted. *See*,

*e.g.*, *id.* at 1:49-52, 56-62; l: 65- 2:10. The inventors thereby achieved nearly perfect compression for these zero-coefficient blocks by communicating them practically without sending any information whatsoever. *See id.* at 2:11-14.

63.     The inventors made substantial contributions to the efficiency of entropy coding. They recognized that the coefficients in neighboring blocks were a good predictor of the coefficients in the block being analyzed and so could be used to select the optimal coding table for the block, yielding enhanced compression. *See, e.g.*, *id.* at 9:34-37; 13:4-11. The inventors disclosed using the same coding table for both inter- and intra-predictive coding, which was inefficient because there could be significant differences between neighboring blocks in the current frame and blocks in subsequent frames. *See, e.g.*, *id.* at 1:33-38. Due to these limitations in the use of coding tables, compression efficiency in previously known entropy coding techniques would vary significantly between different types of content and generally decreased as the quality of content increased. *Id.* at 1:39-44. These problems (and others) were overcome by the inventors of the '238 patent.

64.     The innovations of the '238 patent provided a significant advance in compression that was recognized throughout the industry. In fact, the compression techniques of the '238 patent are used in the ubiquitous video codec, H.264. H.264 was revolutionary in the video industry, as it provided a quantum leap of improvement over the video codecs that had previously been commonly used, such as Motion JPEG video and MPEG-2. In particular, H.264 "has an 80% lower bitrate than Motion JPEG video" and "the bitrate savings can be as much as 50% or more compared to MPEG-2."[6]

---

[6] *What is H264 Encoding?* BlackBox, https://www.blackbox.co.uk/gb-gb/page/38313/Resources/Technical-Resources/Black-Box-Explains/AV/What-is-H264-video-encoding/.

**D.  U.S. Patent No. 8,139,878**

65.    On March 20, 2012, the United States Patent Office issued U.S. Patent No. 8,139,878, titled "Picture Coding Method And Picture Decoding Method" (the "'878 patent").  VL owns all rights and title to the '878 patent, as necessary to bring this action. A true and correct copy of the '878 patent is attached hereto as Exhibit D.

66.    The '878 patent, which shares the same specification with the '238 patent generally relates to video and audio coding. Video and audio coding refers to both the encoding and decoding of video or audio content. Video and audio coding may include compression techniques that minimize the size of the data that is sent between the encoder and the decoder by, e.g., removing redundancies and then efficiently representing the remaining data for transmission.

67.    The '878 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '878 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '878 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

68.    Encoding video content pursuant to the inventions of the '878 patent allows the content to be made small for storage and transmission, while decoding permits the viewer to watch high-quality content on his or her device. In addition to making real-time streaming of content possible, every incremental increase in compression efficiency yields substantial benefits to companies that store, process, transmit or access video.

69.    The '878 patent describes breakthrough techniques for encoding audiovisual content so that it can be transmitted and stored with fewer resources. The patent vastly improves upon existing methods, and the core technology it describes has been used throughout the industry for years as the gold standard for coding video.

70.    In particular, the '878 patent is directed to encoding audio and video content. With respect to video, the '878 patent describes a type of coding called "Context-based Adaptive Variable Length Coding," or "CAVLC." *See, e.g.*, Ex. D at 1: 49-52. Content encoded would then be stored or transmitted before ultimately being decoded for playback using the techniques of the '238 patent.

71.    When encoded, the image data in a particular image block is represented by, among other things, "coefficients." *Id*. at 1:63-67; 7:38-43; 21:60-66; 25:29-36. Larger coefficients for a block may indicate a larger amount of changes in that block as compared with a reference block. *See id.* For many blocks, there are no such changes, and so all the coefficients have a value of zero. *See id.* at 21:60-66. The inventors of the '878 patent recognized that these "zero-coefficient" blocks allow for compression. *See*, *e.g.*, *id.* at 1:49-52.

72.    The inventors of the '878 patent realized that the decoder did not need to know every single time a zero-coefficient block existed; rather, the decoder needs to know only when blocks have *non-zero* coefficients. They devised a technique wherein data about zero-coefficient blocks are effectively not encoded at all, and only non-zero coefficient block data is stored and transmitted. *See*, *e.g.*, *id.* 1:49-52, 56-62; 1:65 – 2:10. The inventors thereby achieved nearly perfect compression for these zero-coefficient blocks by communicating them practically without sending any information whatsoever. *See id.* at 2:11-14.

73.    The inventors made substantial contributions to the efficiency of entropy coding. They recognized that the coefficients in neighboring blocks were a good predictor of the coefficients in the

block being analyzed and so could be used to select the optimal coding table for the block, yielding enhanced compression. *See, e.g.*, *id.* at 9:34-37; 13:4-11. The inventors disclosed using the same coding table for both inter- and intra-predictive coding, which was inefficient because there could be significant differences between neighboring blocks in the current frame and blocks in subsequent frames. *See, e.g.*, *id.* at 1:33-38. Due to these limitations in the use of coding tables, compression efficiency in previously known entropy coding techniques would vary significantly between different types of content and generally decreased as the quality of content increased. *Id.* at col. 1:39-44. These problems (and others) were overcome by the inventors of the '878 patent.

74.    The innovations of the '878 patent provided a significant advance in compression that was recognized throughout the industry. In fact, the compression techniques of the '878 patent are used in the ubiquitous video codec, H.264. H.264 was revolutionary in the video industry, as it provided a quantum leap of improvement over the video codecs that had previously been commonly used, such as Motion JPEG video and MPEG-2. In particular, H.264 "has an 80% lower bitrate than Motion JPEG video" and "the bitrate savings can be as much as 50% or more compared to MPEG-2."[7]

**E.     U.S. Patent No. 7,970,059**

75.    On June 28, 2011, the United States Patent Office issued U.S. Patent No. 7,970,059, titled "Variable Length Coding Method and Variable Length Decoding Method" (the "'059 patent"). VL owns all rights and title to the '059 patent, as necessary to bring this action. A true and correct copy of the '059 patent is attached hereto as Exhibit E.

76.    The '059 patent generally relates to video and audio coding. Video and audio coding

---

[7] *What is H264 Encoding?* BlackBox, https://www.blackbox.co.uk/gb-gb/page/38313/Resources/Technical-Resources/Black-Box-Explains/AV/What-is-H264-video-encoding/.

refers to both the encoding and decoding of video or audio content. Video and audio coding may include compression techniques to minimize the size of the data that is sent between the encoder and the decoder by removing redundancies and then efficiently representing the remaining data for transmission.

77.    The '059 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '059 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '059 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

78.    Encoding video content pursuant to the '059 patent allows the content to be made small for storage and transmission, while decoding permits the viewer to watch high-quality content on his or her device. In addition to making real-time streaming of content possible, every incremental increase in compression efficiency yields substantial benefits to companies that store, process, transmit or access video.

79.    The '059 patent describes breakthrough techniques for decoding audiovisual content so that it can be transmitted and stored with fewer resources. The patent vastly improves upon existing methods for coding video.

80.    In particular, the '059 patent is directed to decoding audio and video content. With respect to video, the '059 patent describes a type of coding called "Context-based Adaptive Binary Arithmetic Coding," or "CABAC," and the '059 patent describes using a plurality of probability

-23-

tables that are switched during the coding process. *See, e.g.*, Ex. E at 1:49-56.

81.     An arithmetic encoder converts a series of input signals into a representation that may be encoded as a single fractional number, which is communicated in the encoded bitstream. As a result, fewer or less common symbol values are represented using fewer or larger numbers of bits, which can lead to more effective compression than variable length coding.

82.     The innovations of the '059 patent provided a significant advance in compression that was recognized throughout the industry. In fact, the compression techniques of the '059 patent are used in the ubiquitous video codec, H.264. H.264 was revolutionary in the video industry, as it provided a quantum leap of improvement over the video codecs that had previously been commonly used, such as Motion JPEG video and MPEG-2. In particular, H.264 "has an 80% lower bitrate than Motion JPEG video" and "the bitrate savings can be as much as 50% or more compared to MPEG-2."[8]

**F.     U.S. Patent No. 7,525,535**

83.     On April 28, 2009, the United States Patent Office issued U.S. Patent No. 7,525,535 (the "'535 patent"), titled "Portable Terminal."  VL owns all rights and title to the '535 patent, as necessary to bring this action. A true and correct copy of the '535 patent is attached hereto as Exhibit F.

84.     The '535 patent generally relates to capacitive touchscreen devices such as tablets and phones. The original assignee of the '535 patent is LG Electronics, Inc. ("LG"), one of the largest consumer electronics companies at the time of the invention and a major innovator in display technologies. In 2007, the year when the application for the '535 patent was filed, LG was

---

[8] *What is H264 Encoding?*, BlackBox, BlackBox, https://www.blackbox.co.uk/gb-gb/page/38313/Resources/Technical-Resources/Black-Box-Explains/AV/What-is-H264-video-encoding/.

the world's largest producer of CDMA handsets.[9] That year, LG launched the world's first capacitive touchscreen phone.[10]

85.     Before the invention claimed in the '535 patent, touchpads in portable devices attached to the surface of the display. Ex. F, at 1:21-24.  The body of the device needed to have an opening for the touchpad that would be exposed and able to receive input from the user. The user would apply pressure to the touchpad to input information. *Id.*, at 1:25-27. There were major disadvantages of the design of having the touchpad exposed to the outside of the device including (1) the outward exposure of the touchpad resulted in an unattractive appearance of the device and (2) foreign materials, such as dust or water, could permeate the body of the device through the opening. *Id.*, at 1:45-50.

86.     To address these drawbacks, the inventors of the '535 patent designed a device with "a capacitive touch pad" that "is disposed on a display" and an integrally formed transparent window. *Id.*, at 1:55-57. The invention "provide[s] a portable terminal" with "an attractive design" and prevents foreign materials from entering the terminal. *Id.*, at 1:54-59, Fig. 3. The '535 patent describes "a touch screen located between the display and the body" and "the touch screen permit[s] signal input in a capacitive manner to control the mobile communication device." *Id.*, at 2:34-42, 1:60-67. An opaque film located on the inner surface of the upper body blocks the view of the inner structure of the device and defines the transparent window.  *Id.*, at 3:58-65. The portable terminal includes an upper and lower body, and a transparent window integrally formed at the upper body allows for viewing information displayed on the device. *Id.*, at 3:46-50.

---

[9] https://pulse.mk.co.kr/news/english/4475767.

[10]https://web.archive.org/web/20070108070435/http://www.lge.com/about/press_archive/detail/AB_NARCH%7CMENU_1_20302.jhtml.

87.     The '535 patent provides for an attractive appearance, while also preventing foreign materials from permeating the body. The '535 patent also discloses that the touchpad has a flexible printed circuit (FPC) that includes a control circuit mounted on the FPC which provides the benefits of space savings by eliminating the need to place the FPC on the main board. This configuration also has the benefit of allowing for the processing of touch signals more quickly and accurately. *Id*., at 4:63-5:3.

88.     The '535 patent discloses an improvement to portable terminals by providing an aesthetically pleasing, functional improvement to devices with touchpads. When operating a device covered by the '535 patent, the user simply touches the display to operate the device through the touchpad, which is connected to the display and circuitry. A user touches the "touch-sensing unit" of the touchpad through the transparent window and a transparent "signal transferring unit … transfer[s] a signal corresponding to a coordinate value of the touched portion of the touch sensing unit." *Id*., at 4:10-13. When the device is powered on the display is illuminated and the transparent window on the upper body allows the information displayed on the display to be viewed. A user may then touch the touchpad through the transparent window and input a signal to the control circuit from the transparent signal-transferring unit. *Id*., at 4:56-62.

**G.     U.S. Patent No. 8,220,027**

89.     U.S. Patent No. 8,220,027 (the "'027 patent"), titled "Method and System to Convert Conventional Storage to an Audio/Video Server," issued on July 10, 2012. VL owns all rights and title to the '027 patent, as necessary to bring this action. A true and correct copy of the '027 patent is attached as Exhibit G.

90.     The original assignee of the '027 patent is Moonsoon Multimedia ("Moonsoon"), a company that manufactured, developed and sold video streaming and place-shifting devices that

allowed consumers to view and control live television on PCs connected to a local (home) network or remotely from a broadband-connected PC or mobile phone.[11] As a competitor of such companies as Slingbox, Moonsoon created and patented devices that enabled streaming and recording of video content from video sources including live TV, DVD players, video game consoles, and TiVo to multiple PCs wirelessly. Multiple users could connect to the HAVA, one of Moonsoon's products, from any Internet connection simultaneously with channel-changing capabilities and full operation of the video source. The devices allowed a PC, for example, to operate as a personal video recorder with pause, fast forward and rewind functions. The HAVA device also worked as a TV tuner for Windows Media Center-enabled PCs without being directly connected to a video source.[12]

91.    Prior to the time of the invention, personal video recorders (PVRs) could handle recording of real time media data, but a PVR system did not include a live video streaming function to other devices on the network, the storage module was built-in adding an extra cost to a PVR, there was limited storage capacity and memory could not be added easily. In addition, if the storage module failed, the entire unit needed to be replaced. One of the most widely known examples of a PVR was TiVo. Ex. G, at 1:35-49, Fig. 1

92.    Audio/Video ("AV") servers can be used in many applications including controlling recording sessions and making recorded and stored audio/video data available to other devices. Such applications can further involve audio and/or video transmissions over cable and other types of networks, or the transmission can be implemented wirelessly, by, for example,

---

[11] http://www.tvsquad.com/2007/07/02/monsoon-multimedia-launches-new-hava-video-streamers/.

[12] https://en.wikipedia.org/wiki/Monsoon_Multimedia.

Universal Plug and Play (UPnP) audio-video applications, which typically use UPnP AV media servers and UPnP media control points. *Id.*, at 1: 13-23.

93.    UPnP AV media servers store and share digital media and they are available for most operating systems and many hardware platforms. UPnP AV media servers can be characterized as software-based or hardware-based. Software-based UPnP AV media servers can be run on personal computers, for example, while hardware-based UPnP AV media servers may be run on any NAS (Network Attached Storage) devices or any specific hardware for delivering media such as a PVR. *Id.*, at 1:24-34.

94.    Certain prior art networks contained a dedicated device interface, a storage module attached to a USB port of the dedicated device interface and one or more UPnP media server control points. This prior art approach converted the storage module into a UPnP AV media server. But this approach had disadvantages including that only USB hard drives are supported, there was no media recording function to the hard drive and there was no live video streaming to other devices on the network. *Id.*, at 1:50-63, Fig. 2

95.    Other prior art networks contained a NAS drive and one or more UPnP media server control points on a network. This type of network could make media files available to the UPnP media server control points on the network. However, like other prior art approaches, this prior art approach had disadvantages, including that there was no media streaming recording function and there was no live video streaming function to other devices on the network. In addition, if the memory inside the NAS drive failed, the entire NAS drive must be replaced, there was only a fixed memory capacity, and the NAS drive could not be upgraded with more memory capacity by attaching additional general purpose storage devices. *Id.*, at 1:64-2:9, Fig. 3.

96.     The invention of the '027 patent solved the drawbacks of the prior art systems explained above by providing an improved method and system to make a standard storage module available on a network for media recording and playback. In particular, the patented system includes a storage module having at least one standardized port, a video server coupled to the storage module through the at least one standardized port module, one or more playback devices and a network connecting the video server with the playback devices. *Id.*, at 2:49-55, claim 10.

## FIRST COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 8,291,236)

97.     VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

98.     VL is the assignee and lawful owner of all right, title, and interest in and to the '236 patent. The '236 patent is valid and enforceable.

99.     On information and belief, TCL has directly infringed and continues to directly infringe one or more claims of the '236 patent, including at least claim 140 of the '236 patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States products that embody one or more of the inventions claimed in the '236 patent, including but not limited to the '236 patent Accused Instrumentalities, including TCL devices compatible with HDCP, including TCL devices configured to stream 4K, 8K, and/or HDR content, such as, e.g., Smart TVs as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

100.     The '236 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '236 patent. A claim chart comparing exemplary independent claim 140 of the '236 patent to representative Accused Instrumentalities is attached as Exhibit H.

101.     By making, using, offering for sale, selling and/or importing into the United States the

'236 patent Accused Instrumentalities, TCL has injured VideoLabs and is liable for infringement of the '236 patent pursuant to 35 U.S.C. § 271(a).

102.    TCL has been on notice of its infringement since at least June 7, 2023, when VideoLabs sent a claim chart of the '236 patent to TCL and specifically informed TCL of its infringement of the '236 patent.

103.    TCL of course knows how its products operate, and on information and belief, upon receiving notice of the '236 patent, began investigating the '236 patent and its infringement. TCL has been given further notice of its infringement of the '236 patent through the filing of the Complaint in this Action. On information and belief, TCL is either knowingly infringing the '236 patent or is willfully blind to its infringement and continuing to act in wanton disregard of VideoLabs' patent rights.

104.    Despite becoming aware of or willfully blinding itself to its infringement of the '236 patent, TCL has nonetheless continued to engage in and has escalated its infringing activities by continuing to develop, advertise, make available, and use the '236 patent Accused Instrumentalities. On information and belief, TCL has made no attempts to design around the '236 patent or otherwise stop its infringing behavior.

105.    TCL's infringement of the '236 patent therefore has been and remains willful.

106.    As a result of TCL's direct infringement of the '236 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for TCL's infringement, but in no event less than a reasonable royalty for the use made of the invention by TCL, together with interest and costs as fixed by the Court.

107.    On information and belief, despite having knowledge of the '236 patent and knowledge that it is directly infringing one or more claims of the '236 patent, TCL has nevertheless

continued its infringing conduct and disregarded an objectively high likelihood of infringement. TCL's infringing activities relative to the '236 patent have been, and continue to be, willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

108.    TCL's acts of direct infringement have caused and continue to cause damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of TCL's wrongful acts in an amount to be proven at trial.

## SECOND COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 8,667,304)

109.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

110.    VL is the assignee and lawful owner of all right, title, and interest in and to the '304 patent. The '304 patent is valid and enforceable.

111.    On information and belief, TCL has directly infringed and continues to directly infringe one or more claims of the '304 patent, including at least claim 5 of the '304 patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States products that embody one or more of the inventions claimed in the '304 patent, including but not limited to the '304 patent Accused Instrumentalities, including TCL devices compatible with HDCP as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

112.    The '304 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '304 patent. A claim chart comparing exemplary independent claim 5 of the '304 patent to representative Accused Instrumentalities is attached as Exhibit I.

113.    By making, using, offering for sale, selling and/or importing into the United States the '304 patent Accused Instrumentalities, TCL has injured VideoLabs and is liable for infringement of the '304 patent pursuant to 35 U.S.C. § 271(a).

114.    TCL has been on notice of its infringement since at least June 7, 2023, when VideoLabs sent a claim chart of the '304 patent to TCL and specifically informed TCL of its infringement of the '304 patent.

115.    TCL of course knows how its products operate, and on information and belief, upon receiving notice of the '304 patent, began investigating the '304 patent and its infringement. TCL has been given further notice of its infringement of the '304 patent through the filing of the Complaint in this Action. On information and belief, TCL is either knowingly infringing the '304 patent or is willfully blind to its infringement and continuing to act in wanton disregard of VideoLabs' patent rights.

116.    Despite becoming aware of or willfully blinding itself to its infringement of the '304 patent, TCL has nonetheless continued to engage in and has escalated its infringing activities by continuing to develop, advertise, make available, and use the '304 patent Accused Instrumentalities. On information and belief, TCL has made no attempts to design around the '304 patent or otherwise stop its infringing behavior.

117.    TCL's infringement of the '304 patent therefore has been and remains willful.

118.    As a result of TCL's direct infringement of the '304 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for TCL's infringement, but in no event less than a reasonable royalty for the use made of the invention by TCL, together with interest and costs as fixed by the Court.

119.    On information and belief, despite having knowledge of the '304 patent and

knowledge that it is directly infringing one or more claims of the '304 patent, TCL has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. TCL's infringing activities relative to the '304 patent have been, and continue to be, willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

120.    TCL's acts of direct infringement have caused and continue to cause damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of TCL's wrongful acts in an amount to be proven at trial.

## THIRD COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 7,769,238)

121.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

122.    VL is the assignee and lawful owner of all right, title, and interest in and to the '238 patent. The '238 patent is valid and enforceable.

123.    On information and belief, TCL has directly infringed claim 1 of the '238 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '238 patent, including but not limited to the '238 patent Accused Instrumentalities, including TCL devices configured to support the H.264 standard, including TCL's Smart TVs (e.g., TCL's P735)), projectors, mobile phones, and tablets  as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

124.    The '238 patent Accused Instrumentalities satisfy all claim limitations of claim 1 of the '238 patent. A claim chart comparing independent claim 1 of the '238 patent to representative

Accused Instrumentalities is attached as Exhibit J.

125.    By having made, used, offered for sale, sold and/or imported into the United States the '238 patent Accused Instrumentalities, TCL has injured VideoLabs and is liable for infringement of the '238 patent pursuant to 35 U.S.C. § 271(a).

126.    TCL has been on notice of its infringement since at least August 23, 2022 when VideoLabs wrote to Qian Wen, Americas Director of Legal Affairs, TCL North America, a subsidiary of TCL Electronics, and specifically informed TCL of its infringement of the '238 patent.

127.    TCL of course knows how its products operate, and on information and belief, upon receiving notice of the '238 patent, began investigating the '238 patent and its infringement. On information and belief, TCL either knowingly infringed the '238 patent or was willfully blind to its infringement and continuing to act in wanton disregard of VideoLabs' patent rights.

128.    Despite becoming aware of or willfully blinding itself to its infringement of the '238 patent, TCL continued to engage in and escalate its infringing activities by continuing to develop, advertise, make available, and use the '238 patent Accused Instrumentalities. On information and belief, TCL made no attempts to design around the '238 patent or otherwise stop its infringing behavior prior to the expiration of the '238 patent.

129.    TCL's infringement of the '238 patent therefore has been willful.

130.    TCL also indirectly infringed the '238 patent by inducing others to infringe and contributing to the infringement of others, including third-party users of the '238 patent Accused Instrumentalities in this District and throughout the United States. As described above, on information and belief, TCL has known about the '238 patent since at least August 22, 2023.

131.    On information and belief, TCL has actively induced the infringement of the '238 patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '238 patent Accused

Instrumentalities by third parties in the United States. TCL knew or was willfully blind to the fact that its conduct would induce these third parties to act in a manner that infringed the '238 patent in violation of 35 U.S.C. § 271(a).

132.    TCL actively and intentionally encouraged others to infringe the '238 patent. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (advertising or instructing an infringing use "show an affirmative intent that the product be used to infringe."); *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1334 (Fed. Cir. 2019) (advertising to customers and instructing them on how to engage in an infringing use satisfied the intent requirement); *Affinity Labs of Texas, LLC v. Toyota Motor North America.*, No. 13-cv-365, 2014 WL2892285, *7 (W.D. Tex. May 12, 2014) (intent satisfied where defendant provided "technical support and services, as well as detailed explanations, instructions and information as to arrangements, applications and uses" of accused products).

133.    TCL actively encouraged third parties to directly infringe the '238 patent by, for example, marketing the '238 patent Accused Instrumentalities and infringing functionalities to consumers; working with consumers to implement, and/or operate the '238 patent Accused Instrumentalities and infringing functionalities; fully supporting and managing consumers' continuing use of the '238 patent Accused Instrumentalities and infringing functionalities; and providing technical assistance to consumers during their continued use of the '238 patent Accused Instrumentalities and infringing functionalities.[13]

134.    For example, TCL induced third parties to infringe the '238 patent by encouraging and instructing them to, e.g., use the '238 patent Accused Instrumentalities to stream audiovisual content.

---

[13] *See, e.g.*, https://www.tcl.com/global/en/blog/introduce-tcl-2022-lineup; https://www.tcl.com/global/en/tvs/p735.

As an example, TCL encourages its customers and users to "fall in love with streaming shows" and to "[w]atch 700,000+ movies and TV episodes" via streaming apps.[14]

135.    Additionally, the '238 patent Accused Instrumentalities during their normal and intended operation of streaming audiovisual content having H.264 data, infringed the '238 patent without any additional specific action of end users. By instructing and encouraging others to stream content, TCL thus actively and intentionally encouraged others to infringe the '238 patent.

136.    In response to TCL's instructions and encouragement, consumers infringed the '238 patent via the '238 patent Accused Instrumentalities.

137.    On information and belief, TCL contributorily infringed the '238 patent under 35 U.S.C. § 271(c) by having imported, sold, and/or offered to sell within the United States the '238 patent Accused Instrumentalities (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use. For example, the video and audio codecs of the Accused Instrumentalities are material, have no substantial non-infringing uses, and are known by TCL to be especially made or adapted for use in a manner that infringed the '238 patent.

138.    As a result of TCL's direct and indirect infringement of the '238 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for TCL's infringement, but in no event less than a reasonable royalty for the use made of the invention by TCL, together with interest and costs as fixed by the Court.

139.    On information and belief, despite having knowledge of the '238 patent and knowledge that it has directly and/or indirectly infringed the '238 patent, TCL nevertheless continued

---

[14] *See, e.g.*, https://www.tcl.com/global/en/blog/introduce-tcl-2022-lineup; https://www.tcl.com/global/en/tvs/p735.

its infringing conduct and disregarded an objectively high likelihood of infringement prior to the expiration of the '238 patent. TCL's infringing activities relative to the '238 patent have been willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

140.    TCL's acts of direct and indirect infringement have caused damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of TCL's wrongful acts in an amount to be proven at trial.

## FOURTH COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 8,139,878)

141.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

142.    VL is the assignee and lawful owner of all right, title, and interest in and to the '878 patent. The '878 patent is valid and enforceable.

143.    On information and belief, TCL has directly infringed and continues to directly infringe claim 1 of the '878 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '878 patent, including but not limited to the '878 patent Accused Instrumentalities, including TCL devices configured to perform video encoding consistent with the H.264, including, e.g., TCL's tablets and smartphones such as  the TCL NXTPAPER 14 as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

144.    The '878 patent Accused Instrumentalities satisfy all claim limitations of claim 1 of the '878 patent. A claim chart comparing independent claim 1 of the '878 patent to representative

Accused Instrumentalities is attached as Exhibit K.

145.    By having made, used, offered for sale, sold and/or imported into the United States the '878 patent Accused Instrumentalities, TCL has injured VideoLabs and is liable for infringement of the '878 patent pursuant to 35 U.S.C. § 271(a).

146.    TCL has been on notice of its infringement since at least August 23, 2022 when VideoLabs wrote to Qian Wen, Americas Director of Legal Affairs, TCL North America, a subsidiary of TCL Electronics and specifically informed TCL of its infringement of the '878 patent.

147.    TCL of course knows how its products operate, and on information and belief, upon receiving notice of the '878 patent, began investigating the '878 patent and its infringement. On information and belief, TCL either knowingly infringed the '878 patent or was willfully blind to its infringement and continuing to act in wanton disregard of VideoLabs' patent rights.

148.    Despite becoming aware of or willfully blinding itself to its infringement of the '878 patent, TCL continued to engage in and escalate its infringing activities by continuing to develop, advertise, make available, and use the '878 patent Accused Instrumentalities. On information and belief, TCL made no attempts to design around the '878 patent or otherwise stop its infringing behavior.

149.    TCL's infringement of the '878 patent therefore has been and remains willful.

150.    TCL also indirectly infringes the '878 patent by inducing others to infringe and contributing to the infringement of others, including third-party users of the '878 patent Accused Instrumentalities in this District and throughout the United States. As described above, on information and belief, TCL has known about the '878 patent since at least August 23, 2022.

151.    On information and belief, TCL has actively induced the infringement of the '878 patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '878 patent Accused

Instrumentalities by third parties in the United States. TCL knew or was willfully blind to the fact that its conduct would induce these third parties to act in a manner that infringed the '878 patent in violation of 35 U.S.C. § 271(a).

152.    TCL actively encourages and continues to actively encourage others to directly infringe the '878 patent by, for example, marketing the '878 patent Accused Instrumentalities and infringing functionalities to consumers; working with consumers to implement, and/or operate the '878 patent Accused Instrumentalities and infringing functionalities; fully supporting and managing consumers' continuing use of the '878 patent Accused Instrumentalities and infringing functionalities; and providing technical assistance (e.g., Mobile Support) to consumers during their continued use of the '878 patent Accused Instrumentalities and infringing functionalities.[15]

153.    For example, TCL induced third parties to infringe the '878 patent by encouraging and instructing them to, e.g., use the '878 patent Accused Instrumentalities to stream or store audiovisual content. As an example, TCL encouraged its users to use the Accused Instrumentalities for audiovisual call streaming to make "crisp calls," resulting in infringement of the '878 patent.[16]

154.    TCL actively and intentionally encouraged others to infringe the '878 patent. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (advertising or instructing an infringing use "show an affirmative intent that the product be used to infringe."); *Barry v. Medtronic, Inc.,* 914 F.3d 1310, 1334 (Fed. Cir. 2019) (advertising to customers and instructing them on how to engage in an infringing use satisfied the intent requirement); *Affinity Labs of Texas, LLC v. Toyota Motor North America.,* No. 13-cv-365, 2014 WL2892285, *7 (W.D.Tex. May 12,

---

[15] *See, e.g.*, https://www.tcl.com/global/en/tablets/tcl-nxtpaper-14; https://www.tcl.com/global/en/support-mobile.

[16] *See, e.g.*, https://www.tcl.com/global/en/tablets/tcl-nxtpaper-14.

2014) (intent satisfied where defendant provided "technical support and services, as well as detailed explanations, instructions and information as to arrangements, applications and uses" of accused products).

155.    Additionally, the '878 patent Accused Instrumentalities during their normal and intended operation of streaming or storing of audiovisual content having H.264 data, infringed the '878 patent without any additional specific action of end users. By instructing and encouraging others to stream content, TCL thus actively and intentionally encouraged others to infringe the '878 patent.

156.    In response to TCL's instructions and encouragement, consumers and developers infringed and continue to infringe the '878 patent via the '878 patent Accused Instrumentalities.

157.    On information and belief, TCL contributorily infringes the '878 patent under 35 U.S.C. § 271(c) by importing, selling, and/or offering to sell within the United States the '878 patent Accused Instrumentalities (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use. For example, the video and audio codecs of the Accused Instrumentalities are material, have no substantial non-infringing uses, and are known by TCL to be especially made or adapted for use in a manner that infringes the '878 patent.

158.    As a result of TCL's direct and indirect infringement of the '878 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for TCL's infringement, but in no event less than a reasonable royalty for the use made of the invention by TCL, together with interest and costs as fixed by the Court.

159.    On information and belief, despite having knowledge of the '878 patent and knowledge that it is directly and/or indirectly infringing the '878 patent, TCL nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. TCL's

infringing activities relative to the '878 patent have been and continue to be willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

160.    TCL's acts of direct and indirect infringement have caused and continue to cause damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of TCL's wrongful acts in an amount to be proven at trial.

## **FIFTH COUNT**

## **(INFRINGEMENT OF U.S. PATENT NO. 7,970,059)**

161.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

162.    VL is the assignee and lawful owner of all right, title, and interest in and to the '059 patent. The '059 patent is valid and enforceable.

163.    On information and belief, TCL has directly infringed one or more claims of the '059 patent, including at least claim 1 of the '059 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '059 patent, including but not limited to the '059 patent Accused Instrumentalities, including TCL devices configured to support the H.264 standard, including TCL's Smart TVs (e.g., TCL's P735)), projectors, mobile phones, and tablets as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

164.    The '059 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '059 patent. A claim chart comparing exemplary independent claim 1 of the '059 patent to representative Accused Instrumentalities is attached as Exhibit L.

165. By having made, used, offered for sale, sold and/or imported into the United States the '059 patent Accused Instrumentalities, TCL has injured VideoLabs and is liable for infringement of the '059 patent pursuant to 35 U.S.C. § 271(a).

166. TCL has been on notice of its infringement since at least August 23, 2022, when VideoLabs wrote to Qian Wen, Americas Director of Legal Affairs, TCL North America, a subsidiary of TCL Electronics, and specifically informed TCL of its infringement of the '059 patent.

167. TCL of course knows how its products operate, and on information and belief, upon receiving notice of the '059 patent, began investigating the '059 patent and its infringement. On information and belief, TCL either knowingly infringed the '059 patent or was willfully blind to its infringement and continuing to act in wanton disregard of VideoLabs' patent rights.

168. Despite becoming aware of or willfully blinding itself to its infringement of the '059 patent, TCL engaged in and escalated its infringing activities by developing, advertising, making available, and using the '059 patent Accused Instrumentalities prior to the expiration of the '059 patent. On information and belief, TCL has made no attempts to design around the '059 patent or otherwise stop its infringing behavior prior to the expiration of the '059 patent.

169. TCL's infringement of the '059 patent therefore has been willful.

170. TCL also indirectly infringed the '059 patent by inducing others to infringe and contributing to the infringement of others, including third-party users of the '059 patent Accused Instrumentalities in this District and throughout the United States. As described above, on information and belief, TCL has known about the '059 patent since at least August 23, 2022.

171. TCL actively and intentionally encouraged others to infringe the '059 patent. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (advertising or instructing an infringing use "show an affirmative intent that the product be used to infringe."); *Barry*

*v. Medtronic, Inc.,* 914 F.3d 1310, 1334 (Fed. Cir. 2019) (advertising to customers and instructing them on how to engage in an infringing use satisfied the intent requirement); *Affinity Labs of Texas, LLC v. Toyota Motor North America.,* No. 13-cv-365, 2014 WL2892285, *7 (W.D. Tex. May 12, 2014) (intent satisfied where defendant provided "technical support and services, as well as detailed explanations, instructions and information as to arrangements, applications and uses" of accused products).

172.    On information and belief, TCL has actively induced the infringement of the '059 patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '059 patent Accused Instrumentalities by third parties in the United States. TCL knew or was willfully blind to the fact that its conduct would induce these third parties to act in a manner that infringed the '059 patent in violation of 35 U.S.C. § 271(a).

173.    TCL actively encouraged third parties to directly infringe the '059 patent by, for example, marketing the '059 patent Accused Instrumentalities and infringing functionalities to consumers; working with consumers to implement, and/or operate the '059 patent Accused Instrumentalities and infringing functionalities; fully supporting and managing consumers' continuing use of the '059 patent Accused Instrumentalities and infringing functionalities; and providing technical assistance to consumers during their continued use of the '059 patent Accused Instrumentalities and infringing functionalities.[17]

174.    For example, TCL induced third parties to infringe the '059 patent by encouraging and instructing them to, e.g., use the '059 patent Accused Instrumentalities to stream audiovisual content. As an example, TCL encourages its customers and users to "fall in love with streaming shows" and

---

[17] *See, e.g.*, https://www.tcl.com/global/en/blog/introduce-tcl-2022-lineup; https://www.tcl.com/global/en/tvs/p735.

to "[w]atch 700,000+ movies and TV episodes" via streaming apps.[18]

175.    Additionally, the '059 patent Accused Instrumentalities during their normal and intended operation of streaming audiovisual content having H.264 data, infringed the '059 patent without any additional specific action of end users. By instructing and encouraging others to stream content, TCL thus actively and intentionally encouraged others to infringe the '059 patent.

176.    In response to TCL's instructions and encouragement, consumers infringed the '059 patent via the '059 patent Accused Instrumentalities.

177.    On information and belief, TCL contributorily infringed the '059 patent under 35 U.S.C. § 271(c) by having imported, sold, and/or offered to sell within the United States the '059 patent Accused Instrumentalities (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use. For example, the video and audio codecs of the Accused Instrumentalities are material, have no substantial non-infringing uses, and are known by TCL to be especially made or adapted for use in a manner that infringed the '059 patent.

178.    As a result of TCL's direct and indirect infringement of the '059 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for TCL's infringement, but in no event less than a reasonable royalty for the use made of the invention by TCL, together with interest and costs as fixed by the Court.

179.    On information and belief, despite having knowledge of the '059 patent and knowledge that it directly and/or indirectly infringed one or more claims of the '059 patent, TCL has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of

---

[18] *See, e.g.*, https://www.tcl.com/global/en/blog/introduce-tcl-2022-lineup; https://www.tcl.com/global/en/tvs/p735.

infringement. TCL's infringing activities relative to the '059 patent have been willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

180.    TCL's acts of direct and indirect infringement have caused damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of TCL's wrongful acts in an amount to be proven at trial.

## SIXTH COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 7,525,535)

181.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

182.    VL is the assignee and lawful owner of all right, title, and interest in and to the '535 patent. The '535 patent is valid and enforceable.

183.    On information and belief, TCL has directly infringed one or more claims of the '535 patent, including at least claim 5 of the '535 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '535 patent, including but not limited to the '535 patent Accused Instrumentalities, including TCL tablets and phones, including TCL's TAB 10s as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

184.    The '535 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '535 patent. A claim chart comparing exemplary independent claim 5 of the '535 patent to representative Accused Instrumentalities is attached as Exhibit M.

185.    By having made, used, offered for sale, sold and/or imported into the United States

the '535 patent Accused Instrumentalities, TCL has injured VideoLabs and is liable for infringement of the '535 patent pursuant to 35 U.S.C. § 271(a).

186.     TCL has been on notice of its infringement since at least August 23, 2022, when VideoLabs wrote to Qian Wen, Americas Director of Legal Affairs, TCL North America, a subsidiary of TCL Electronics, and specifically informed TCL of its infringement of the '535 patent.

187.     TCL of course knows how its products operate, and on information and belief, upon receiving notice of the '535 patent, began investigating the '535 patent and its infringement. On information and belief, TCL either knowingly infringed the '535 patent or was willfully blind to its infringement and continuing to act in wanton disregard of VideoLabs' patent rights.

188.     Despite becoming aware of or willfully blinding itself to its infringement of the '535 patent, TCL engaged in and escalated its infringing activities by developing, advertising, making available, and using the '535 patent Accused Instrumentalities prior to the expiration of the '535 patent. On information and belief, TCL has made no attempts to design around the '535 patent or otherwise stop its infringing behavior prior to the expiration of the '535 patent.

189.     TCL's infringement of the '535 patent therefore has been willful.

190.     As a result of TCL's direct and indirect infringement of the '535 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for TCL's infringement, but in no event less than a reasonable royalty for the use made of the invention by TCL, together with interest and costs as fixed by the Court.

191.     On information and belief, despite having knowledge of the '535 patent and knowledge that it directly and/or indirectly infringed one or more claims of the '535 patent, TCL has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. TCL's infringing activities relative to the '535 patent have been willful, wanton,

malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

192.    TCL's acts of direct and indirect infringement have caused damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of TCL's wrongful acts in an amount to be proven at trial.

## SEVENTH COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 8,220,027)

193.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

194.    VL is the assignee and lawful owner of all right, title, and interest in and to the '027 patent. The '027 patent is valid and enforceable.

195.    On information and belief, TCL has directly infringed and continues to directly infringe one or more claims of the '027 patent, including at least claim 10 of the '027 patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States products that embody one or more of the inventions claimed in the '027 patent, including but not limited to the '027 patent Accused Instrumentalities, including infrastructure and equipment (a "system") that are used to provide TCLtv+ to playback devices, including for example, TVs, projectors, mobile phones, and tablets that play TCLtv+ content, as well as all reasonably similar systems, in violation of 35 U.S.C. § 271(a).

196.    The '027 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '027 patent. A claim chart comparing exemplary independent claim 10 of the '027 patent to representative Accused Instrumentalities is attached as Exhibit N.

197.    By making, using, offering for sale, selling and/or importing into the United States the '027 patent Accused Instrumentalities, TCL has injured VideoLabs and is liable for infringement of the '027 patent pursuant to 35 U.S.C. § 271(a).

198.    TCL has been given notice of its infringement of the '027 patent through the filing of the Complaint in this Action. On information and belief, TCL is either knowingly infringing the '027 patent or is willfully blind to its infringement including by continuing to act in wanton disregard of VideoLabs' patent rights.

199.    Despite becoming aware of or willfully blinding itself to its infringement of the '027 patent, TCL has nonetheless continued to engage in and has escalated its infringing activities by continuing to develop, advertise, make available, and use the '027 patent Accused Instrumentalities. On information and belief, TCL has made no attempts to design around the '027 patent or otherwise stop its infringing behavior.

200.    TCL's infringement of the '027 patent therefore has been and remains willful.

201.    TCL also indirectly infringes the '027 patent by inducing others to infringe and contributing to the infringement of others, including third-party users of the '027 patent Accused Instrumentalities in this District and throughout the United States.

202.    On information and belief, TCL has and continues to actively induce the infringement of the '027 patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '027 patent Accused Instrumentalities by third parties in the United States. TCL knew or was willfully blind to the fact that its conduct would induce these third parties to act in a manner that infringes the '027 patent in violation of 35 U.S.C. § 271(a).

203.    TCL actively and intentionally encouraged and continues to encourage others to infringe the '027 patent. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S.

913, 936 (2005) (advertising or instructing an infringing use "show an affirmative intent that the product be used to infringe."); *Barry v. Medtronic, Inc.,* 914 F.3d 1310, 1334 (Fed. Cir. 2019) (advertising to customers and instructing them on how to engage in an infringing use satisfied the intent requirement); *Affinity Labs of Texas, LLC v. Toyota Motor North America.,* No. 13-cv-365, 2014 WL2892285, *7 (W.D. Tex. May 12, 2014) (intent satisfied where defendant provided "technical support and services, as well as detailed explanations, instructions and information as to arrangements, applications and uses" of accused products).

204.    TCL actively encouraged and continues to actively encourage third parties to directly infringe the '027 patent by, for example, marketing the '027 patent Accused Instrumentalities and infringing functionalities to consumers; working with consumers to implement, install and/or operate the '027 patent Accused Instrumentalities and infringing functionalities; fully supporting and managing consumers' continuing use of the '027 patent Accused Instrumentalities and infringing functionalities; and providing technical assistance to consumers during their continued use of the '027 patent Accused Instrumentalities and infringing functionalities.[19]

205.    For example, TCL induces third parties to infringe the '027 patent by encouraging them to "Download now" the TCL TV+ app to stream content in an infringing manner in order to "elevate [their] entertainment experience." https://apps.apple.com/us/app/tcl-tv/id6476568806. TCL encourages its "customers in North America [to] access [] a wide variety of complimentary entertainment programming" by using the TCLtv+ system.[20] Indeed, TCL provides TCLtv+ in response to its consumers "desire for more content and new experiences." *Id.* Moreover, TCL provides the TCLtv+ application on its devices in an effort to encourage its customers to use the

---

[19] *See, e.g.*, https://www.tcl.com/us/en/press-releases/tcl-tv-plus; https://apps.apple.com/us/app/tcl-tv/id6476568806
[20] https://www.tcl.com/us/en/press-releases/tcl-tv-plus

infringing system. *Id.*

206.    On information and belief, TCL contributorily infringes the '027 patent under 35 U.S.C. § 271(c) by importing, selling, and/or offering to sell within the United States the '027 patent Accused Instrumentalities (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use. For example, TCL's infrastructure equipment for streaming content to users is material, has no substantial non-infringing uses, and is known by TCL to be especially made or adapted for use in a manner that infringes the '027 patent.

207.    As a result of TCL's direct and indirect infringement of the '027 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for TCL's infringement, but in no event less than a reasonable royalty for the use made of the invention by TCL, together with interest and costs as fixed by the Court.

208.    On information and belief, despite having knowledge of the '027 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '027 patent, TCL has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. TCL's infringing activities relative to the '027 patent have been, and continue to be, willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

209.    TCL's acts of direct and indirect infringement have caused and continue to cause damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of TCL's wrongful acts in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

VideoLabs respectfully requests that the Court find in favor of VideoLabs and against TCL, and the Court grant VideoLabs the following relief:

A.    For judgment that TCL is liable for infringement of one or more claims of the Asserted Patents, directly and/or indirectly, either literally and/or under the doctrine of equivalents;

B.    For judgment that TCL has willfully infringed one or more claims of the Asserted Patents, directly and/or indirectly, either literally and/or under the doctrine of equivalents;

C.    For an accounting of all damages sustained by VideoLabs as the result of TCL's acts of infringement, including compensatory damages in an amount according to proof, and in no event less than a reasonable royalty;

D.    For a judgment and order requiring TCL to pay VideoLabs' damages, costs, expenses, and pre- and post-judgment interest for its infringement of the Asserted Patents as provided under 35 U.S.C. § 284;

F.    For a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to VideoLabs its reasonable attorneys' fees; and

G.    For such other and further relief in law and in equity as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, VideoLabs hereby demands

a trial by jury of this action.

Dated: February 10, 2025                  Respectfully submitted,

*/s/ M. Elizabeth Day*
M. Elizabeth Day (*admitted in EDTX*)
California Bar No. 177125
eday@bdiplaw.com
Marc Belloli (*admitted in EDTX*)
California Bar No. 244290
mbelloli@bdiplaw.com
Jerry D. Tice II
Texas State Bar No. 24093263
jtice@bdiplaw.com
**BUNSOW DE MORY LLP**
701 El Camino Real,
Redwood City, CA 94063
Tel: (650) 351-7248
Fax: (415) 426-4744

*Attorneys for Plaintiff*
VIDEOLABS, INC.